The primary question tendered in this case is the right of the plaintiff, the lessee of the defendants, to recover from them the amount necessarily expended by him to install a new electrical system in the leased premise to replace the old and antiquated one that had almost entirely ceased to function.
Defendants resist the suit mainly upon the ground that they were not notified of the necessity to have the new system installed and that, as a condition precedent to their liability for the expense of the new work, they should have had opportunity to have the work done themselves, which opportunity they did not have.
Defendants appealed from judgment that sustained plaintiff's contention.
The leased premise involved herein is identified as being the ground floor of the brick building at municipal numbers 865-867 Texas Street in the City of Shreveport, Louisiana. Plaintiff had occupied the premise under leases from the defendants for some four years prior to the time the electrical system failed. This occurred on July 2, 1947. The efficient conduct of his business requires dependable electrical current to operate the many motors and other equipment employed by him. The electric system, installed in the building, some fifteen or twenty years ago, was considered adequate for all practical purposes at that time, but, under the heavy load it was required to carry to meet plaintiff's needs, it gradually deteriorated until three circuits of the four "went out." This, so long as it continued, paralyzed plaintiff's business activities.
Plaintiff promptly called Frank Parker, an experienced electrician, and, thinking the trouble could be easily remedied, asked him to do what was necessary to restore the current. Parker found that the service equipment had "burned up * * * melted down." It could not be fixed. He then put in what he described as a weather proof socket" which was designed to, and in fact did, temporarily restore the current. Thereafter, he discussed the matter with the city electrician and was informed that as the old system was obsolete and would not provide the maximum security against fire hazard, a modern system of greater capacity would have to be installed in order to pass inspection. This, it is shown, was required by the laws and regulations of the city. However, to meet this requirement it was not necessary to re-wire the leased part of the building.
While there is dispute as to the date when Parker returned to plaintiff's place of business and informed him of the situation with respect to the city's requirements, we are convinced it was on the 9th or 10th of July. Plaintiff inquired about the cost of the new work and was informed that it would be about $100. He then, in the presence of the electrician, called the office of Mr. Alphonse Brenner, who with his sister, Mrs. Bertha B. Florsheim, are the owners and lessors of the property, for the purpose of discussing the matter with him, and of procuring his consent to the expenditure necessary to put in the new system. Mr. Brenner was then absent from the city and would not return for a week, according to information given plaintiff by someone in his office. Without further delay or effort to contact the lessors, plaintiff had Parker do the final work at a cost of $97.50.
We base our conclusion that it was on July 9th or 10th when Parker reported to plaintiff what would have to be done to meet the city's inspection, at which time plaintiff endeavored to get in touch with Mr. Brenner, upon the following facts, to-wit:
The bill of the electrician for services rendered shows a charge of $3.50 on July 2nd for temporary repairs and also shows a charge of $97.50 on July 11th for permanent work and repairs. Mr. Parker is quite sure this bill is correct in all respects, although the secretary of his company prepared it. The permanent work required about one and one-half days. If it began on the 10th it was concluded on the 11th. *Page 635 
If begun on the 9th, it was finished on the 10th. Mr. Brenner left Shreveport for Chicago on July 8th, and returned one week later. Since he was not in the city when called on the telephone by plaintiff, it follows that the call was made after the 8th of July and before the 11th.
There is no doubt that what was done to the electrical system was indispensable, within the meaning of the law pertinent to such matters. Without it the fire hazard would be greatly increased and, in addition, to meet the city's requirements such a system had to be installed.
It is not suggested that plaintiff did not act in perfect good faith in proceeding as he did to have a safe and dependable current provided; nor is it suggested that the cost of the new system was excessive.
The lessors well knew the purpose for which plaintiff leased the property and the use to which he had put the same during his occupancy of it.
R.C.C. Article No. 2692, enumerating some of the obligations of the lessor, numbers the following, viz.:
"To maintain the thing in a condition such as to serve for the use for which it is hired."
Article No. 2693 of the R.C.C. reads as follows:
"The lessor is bound to deliver the thing in good condition, and free from any repairs. He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary; except those which the tenant is bound to make, as hereafter directed."
Repairs, the cost of which are imposed upon the lessee, are listed in Article No. 2716 of the R.C.C. These do not cover, expressly nor by implication, the sort of repairs and improvements involved in this case. This being true, of course, the duty to make or pay for the costs thereof, rests upon the lessor. However, Article No. 2694 of the R.C.C., relied upon by defendants to escape reimbursement to plaintiff, reads:
"If the lessor does not make the necessary repairs in the manner required in the preceding article, the lessee may call on him to make them. If he refuses or neglects to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable."
The lease contract between the parties does not derogate from the provisions of this article.
The contract of lease in effect when the electric system failed, and the one preceding it, were negotiated by plaintiff and Mr. Brenner who admits that he acted as Mrs. Florsheim's agent, although the contract itself was actually signed by her son as her agent. Plaintiff was not acquainted with Mrs. Florsheim at the time nor with her son. In every instance when repairs to the leased premises were necessary he consulted Mr. Brenner only, and invariably he was authorized by him to have the repairs made at the lessors' expense. In view of this course of conduct, it was but natural that plaintiff first sought to discuss the matter with Mr. Brenner. But, the question arises: Was he not required to go further under the law in order to be in a position to hold the lessor responsible for the repair bill? While it is true plaintiff did not personally know Mrs. Florsheim, he did know she lived in Shreveport because he monthly paid directly to her one-half of the monthly rent. In addition to this, Mr. Brenner was not so far away that he could not have been contacted by telephone before the repairs were made by plaintiff.
It is true, as contended by defendants, that the jurisprudence of this state abounds in cases that strictly construe and enforce Article No. 2694 of the R.C.C. as written. The earliest case on the subject by the Supreme Court is that of Scudder v. Paulding, 4 Rob. 428, and the last one, so far as we have been able to discover, is Hartz v. Stauffer et al.,163 La. 382, 111 So. 794. In many of these cases the court simply held that it is necessary to put the lessor in default as regards the making of necessary improvements before the lessee is warranted in doing so and then deducting the cost thereof from rent. So important to the lessor is this strict construction that the court in Shall v. Banks, 8 Rob. 168, 171, said: *Page 636 
"The owners of houses would soon be ruined, if it were permitted to every tenant to make such repairs as his fancy or caprice might dictate, without notifying the owner of the property of the intention."
In Mullen v. Kerlec, 115 La. 783, 40 So. 46, the Court has this to say concerning said Article No. 2694, to-wit:
"The Civil Code seems plain enough that the right of the lessee to make indispensable repairs at the expense of the lessor arises only after calling on the lessor to make such repairs and after his refusal or neglect to make them. We do not think that the lessee can be permitted to anticipate the refusal of the lessor to repair and on that ground refuse to pay the rent when due."
No exceptions whatever have been written by the courts into said article. We can conceive of cases, however, extreme in their facts, where the ends of justice and of equity as well would be subserved by doing so, but after due consideration of the facts in the present case, we do not think it would be proper to so classify it.
Plaintiff's counsel forcefully argues that plaintiff was confronted with an emergency that did not admit of further delay. The facts do not entirely support this position. The temporary repairs to the system gave satisfactory service for at least a week. During this time Mr. Brenner and Mrs. Florsheim both were in Shreveport, and plaintiff made no effort to contact either of them nor Mrs. Florsheim's son, who signed the lease for her. It is not to any extent shown that the temporary repairs to the system would not have continued to provide adequate current for another week as it had already done.
Plaintiff also argues that since defendants have refused to reimburse him for the expense of repairs, it logically follows that they would not have agreed to pay for same had they been notified of the necessity therefor before the work was done; that it would have been vain and idle to have called upon them to make the repairs. It may be true that lessors would have evinced such an attitude toward the matter, but certainly had they done so plaintiff would then have been well within his rights and the law to have caused the repairs to be made and thereafter to have deducted the cost of same from rent.
The secondary defenses urged by defendants, in view of what we have said hereinbefore, need not be passed on.
For the reasons herein given, the judgment appealed from is annulled, avoided and reversed; and there is now judgment in favor of defendants and against plaintiff, rejecting the demand herein and dismissing the suit at plaintiff's cost.